[Civ. No. 15237.   First Dist., Div. Two.   Dec. 7, 1953.]

LOUIS BECKER, Appellant, v. THE CITY AND COUNTY
OF SAN FRANCISCO, Respondent.

Fahey, Castagnetto & Gallen for Appellant.

Dion R. Holm, City Attorney, and Clayton W. Horn,
Deputy City Attorney, for Respondent.

GOODELL, J.—Plaintiff sued for serious injuries sustained when he was hit by a municipal railway bus at the northeasterly corner of Mission and 23d Streets in San Francisco. The jury returned a verdict for the defense and plaintiff appealed after a new trial had been denied.

Twenty-third Street runs approximately easterly and westerly and Mission Street at that point runs approximately northerly and southerly. On April 21, 1950, about 11 a. m. plaintiff while standing on the easterly curb of Mission Street at a regular bus-stop leaned forward and his head came into contact with the side of a moving bus, which was headed northerly.

Plaintiff, who was about 82, was unable to testify because of his serious brain injuries. The first blow on his head spun him around several times and he struck the sidewalk on the back of his head, sustaining a fracture of the skull.

There were four witnesses to the accident, namely Kelsey, who was waiting on the curb for the bus; Platt, a passenger sitting on the right-hand side of the bus looking out the window; Lobley, a passenger standing on the right-hand side of the bus, also looking out, and Carlson, the operator, in the driver's seat.

Kelsey, a witness for the plaintiff, saw practically all that happened as he leaned against a pole looking toward the south. He saw the bus come to a stop at the southeasterly corner of Mission and 23d and then cross 23d and draw in to the bus-stop on the northeast corner. He saw the impact, and as plaintiff was spun around attempted to save him from falling.

Kelsey testified that as plaintiff stood on the sidewalk about 10 feet south of the pole his "toes were just about even with the outside edge of the curb"; that from an erect position "he leaned, nodded his head slightly forward as if to spit onto the gutter"; he "bent forward from the waist up"; he moved his head "maybe six inches or so." He testified that when the bus came into the loading zone at a slight angle its front end was 14 or 15 inches out from the curb; that as the bus was passing plaintiff, plaintiff "leaned way out from the hips" and that the portion of the bus which came in contact with him was "the door well, in the front section of the bus"; he "leaned out just as the bus hit him"; that the front of the bus was just even with him as he leaned forward, and "he banged his head then into the side of the bus" as it was passing; the plain-

tiff's head, he testified, was the only part of his body that came in contact with the bus. He testified that when he first saw him, plaintiff was facing west, then looked "back and forth up and down the street" and as the bus was coming in and he leaned forward he was looking straight ahead, not in the direction from which the bus was coming, or toward the bus. The witness gave an approximation "of depreciation in elevation . . . between the height of the plaintiff and the point where he leaned over and his head was hit" as "between 8 and 10, maybe 12 inches." He testified that the blow "caught him more or less on the forehead"; that his head "bounced off the bus" and that he had warned "Look out!" or something like that because plaintiff was placing himself in a position where he was liable to be hit by the bus. He testified that he heard no horn blow.

Platt, a defense witness, was a bus operator for the municipal railway but off duty and riding in the bus as a passenger. He testified that he saw through the window "a man standing near the loading zone, and he bent over just as the bus was approaching . . . when he bent over . . . I heard a passenger scream." He estimated that plaintiff was standing 12 or 18 inches from the curb, and right in the loading zone. He said he could see nothing to cause him to bend over, and said he did not know "whether he bent over after the front of the bus passed him or if he bent over in front of the bus"; he could not see. When he bent over he was facing straight across Mission Street and that at no time that he saw him was he looking in the direction from which the bus was coming. "Q. Can you tell us whether or not any part of the bus went over onto the sidewalk in that loading zone area? A. Well, I don't think so. . . . The bus was parallel."

Lobley, a defense witness, testified that from where he stood in the bus right behind the front door, as the bus was coming into the loading zone he "saw a man standing on the edge of the curb and his feet were right . . . on the curb line . . . and this man bent over and as he did so, as he passed the front door he hit the bus, turned around, the bus whirled him around, he landed on the sidewalk on the back of his head." When plaintiff bent over, Lobley testified, the front of the bus was approximately 6 or 8 inches from the curb and approximately 24 inches in back of the pole; the front of the bus had passed the plaintiff before he bent over; plaintiff's head struck the bus back of the front door. "As

the bus swung in he leaned over. In fact, he leaned over before the bus got to him, and in doing so he struck his head in that section of the bus right there that I have marked. . . . Q. Was there any reason that you could see for him to bend over, to cause him to bend? A. No, sir, it just amazed me at the moment. It happened so fast. Q. Did any part of the bus at any time, so far as you could observe, go over upon the sidewalk area? A. No, sir, definitely not.'' On cross-examination he testified that when he said 6 inches he meant ''the distance between the curb and the wheels or the body of the bus.'' He said he realized that the wheels are in further underneath the body. He testified that the impact was so strong it could be felt throughout the bus. He testified that plaintiff ''hit that section [of the bus] just back of the front, just where the hinges are. . . . You know, where the door swings open'' . . . ''Q. Something that protrudes out from the side of the bus? A. Yes, sir, on the corner.''

Carlson, the bus operator, a witness for the defense, testified that as he drove into the bus-stop he saw plaintiff on the sidewalk, but knew nothing of the impact until a passenger screamed.

With respect to the speed of the bus as it approached the bus-stop, Kelsey testified that *as it crossed 23d* it was ''around 10 miles an hour''; Platt testified that as it came into the loading zone it was about 5 miles per hour. Lobley put it at ''no more than maybe 5, 6, 7 miles an hour; something like that'' but added that that would be hard for him to determine.

With respect to the proximity of the bus to the curb Kelsey testified that at the time of impact it ''was still coming on an angle, and I imagine his rear wheels were about 4 feet out of the curb and the front was just about even with the curb.'' On cross-examination he testified that at the time of impact the front end of the bus ''was just out a few inches, or just about even with the curb. . . . It was in fairly close.'' Platt testified: ''Q. Can you tell us whether or not any part of the bus went over onto the sidewalk in that loading zone area? A. Well, I dont think so. . . . The bus was paralled to the curb, so I am sure no part of the bus went over the curb.'' On cross-examination he testified ''Q. And was the bus coming in at an angle at that time? [when plaintiff bent over]. A. Well, I dont hardly think it was at an angle . . . the bus was about straight at that time, or parallel to the curb at that time.'' He testified that he

could not say how close the bus was to plaintiff when he bent over, but that "it was close." He testified or repeated that he did not know "whether he bent over as the bus was approaching him or after the front of the bus passed, and he bent over against the bus" . . . he "couldn't see whether he was just in front of the bus or whether he bent over just at the time the front of the bus passed the spot he was standing."

Platt testified that after the impact and the bus had come to rest it was, as near as he could recall, about "six inches from the curb, parallel with the curb." He said he thought the bus was straightened before the impact. On redirect Platt testified that he was sure the forward bend took plaintiff "beyond the curb line out into the street."

Lobley testified that as the bus crossed 23d Street it came in at an angle toward the curb, but that the front part of the bus did not come anywhere nearer to the curb than 6 inches.

Kelsey testified that the bus moved "about 4 feet or so after the impact at a slight angle although it was closer to the curb. The driver set his brakes and got out and asked what happened and that when it had halted after the impact he thought the bus was just within the marked lines of the bus-stop—"within its bound."

Platt testified the bus went only 3 or 4 feet after the impact.

Appellant's attack is based solely on claimed errors in the instructions. We agree with appellant that the factual situation called for precise instructions, but we are satisfied that such instructions were given.

■ This case emphasizes the necessity for adherence to the rule that instructions must be read as a whole. Appellant singles out an instruction reading: "Under the evidence . . . if you find that no part of the bus went over or upon the sidewalk adjacent to the bus loading zone, then the defendant was operating said bus with the degree of care required by law. . . ."

When read by itself the instruction might appear questionable, but when read in context all doubt disappears. It was the last of a group of six instructions reading as follows:

(A) "If the plaintiff was a passenger, the defendant owed him the duty of the utmost care. If he was not a passenger, then the defendant owed him the duty of ordinary care."

(B) "In either instance, under the facts of this case, that care, whether it be ordinary care or utmost care, is the

same. That care was to bring the bus to a stop for the purpose of receiving passengers at the designated stopping place in a careful and prudent manner, approaching as near to the curb as practical but so that no portion of the bus protruded over or beyond the sidewalk.''

(C) ''If you find that a portion of the bus was over or beyond the sidewalk, then this was an act of negligence, and if it was a proximate cause of the injury, then your verdict should be for the plaintiff unless you find that the plaintiff was guilty of contributory negligence.''

(D) ''In any event, whether you find that the defendant had a duty of utmost care because of the relationship of common carrier and passenger existing between itself and the plaintiff, or had merely a duty of ordinary care because of the nonexistence of such relationship, you are instructed that it would be the duty of the bus driver to keep any portion of the bus from coming over the curb at the bus stop so as to endanger any persons standing on the sidewalk at the bus stop. A breach of this duty would constitute negligence.''

(E) ''If you find from a preponderance of the evidence that as the bus was pulling into the loading zone the plaintiff was standing in a position of safety on the sidewalk adjacent to the loading zone, and that he moved from such position to one of danger by projecting part of his body beyond the curb line, and as a direct and proximate cause of such change a collision between the plaintiff and the bus occurred, I instruct you that the plaintiff was guilty of contributory negligence and your verdict must be in favor of defendant.''

(F) ''Under the evidence in this case if you find that no part of the bus went over or upon the sidewalk adjacent to the bus loading zone, then the defendant was operating said bus with the degree of care required by law, whether it be the highest degree or that of ordinary care.''

Instruction ''F'' simply gives the converse of instruction ''C,'' and each balances the other. When all six instructions are read together it is clear that they neither misstate the law nor invade the province of the jury.

The instructions in this case were lengthy, and in our opinion they were wholly fair. The jury returned after deliberating about an hour and a half and asked for instructions on the duties of a driver coming into a loading zone. The court reread several instructions which had been already given. It is argued that this led to confusion but, as we read the record, there was no more confusion than is usual

in such instances. Appellant's claim that the judge instructed on the facts is not borne out by the record.

The court instructed: "As the plaintiff, according to the evidence, cannot relate or recall what happened, the law presumes that Louis Becker, the plaintiff in this action, in his conduct at the time of and immediately preceding the accident here in question, was exercising ordinary care and was obeying the law." The only eyewitness who testified for the plaintiff was Kelsey, and his testimony (summarized rather fully above) gave a very full picture of the acts and conduct of the plaintiff immediately prior to and at the time of the impact. Despite this instruction the jury found for the defendant on evidence which is not challenged for insufficiency.

This was purely and simply a fact case and in our opinion the plaintiff had a perfectly fair trial.

The judgment is affirmed.

Nourse, P. J., and Dooling, J., concurred.